RECEIVED
IN ALEXANDRIA, LA.

APR − 8 2014

TONY R. MOORE, CLERK
BY_____
       DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **BRUCE PARTIN** | : | **DOCKET NO. 11-1999** |
| **VS.** | : | **JUDGE TRIMBLE** |
| **KANSAS CITY SOUTHERN RAILWAY CO** | : | **MAGISTRATE JUDGE KAY** |

**OPINION**

*Operative facts*

On May 11, 2009, plaintiff, Bruce Partin, was employed as a security guard for Weiser Security Services, Inc. (Weiser) at the PPG plant in Calcasieu Parish Louisiana.  At the time, defendant, the Kansas City Southern Railway Company (KCS) operated a train within the plant, moving PPG product in train cars.  The work of KCS involved the engine coupling with freight cars at varying intervals.  In addition to coupling, the engine moves blocks of train cars to and from various locations within the plant.  On the date in question, Mr. Partin rode the train for three hours from noon until 3:00 p.m.  No records are kept to establish how many times during those three hours the coupling maneuver was performed.

Mr. Partin was an employee of Weiser in the capacity of security guard.  Weiser had a contract for security services with PPG.  PPG contracted with KCS for train service in the plant. There was no contract between KCS and Weiser.  In early May of 2009, there was a chemical release in the PPG plant which apparently raised some concern with KCS about the rail workers employed by them getting immediate notification of any such releases in the future.  KCS expressed its concern

to PPG, which in turn went to Weiser to arrive at a solution.  It was decided that Weiser would place a security guard on the train engine with the engineer.  The guard would carry a radio from which he would be notified by PPG if a release occurred in the plant requiring action, such as evacuation, of the KCS employees.  The guard would inform the engineer of any such occurrence, and the engineer would relay the information to KCS personnel.

Weiser used a rotating system of assigning guards to ride the train engine, and on May 11, 2009, Mr. Bruce Phelps, the supervisor for Weiser security guards in the plant, assigned Mr. Partin the duty of riding on the train with the radio.  Mr. Phelps did not provide any safety instructions to Mr. Partin relative to riding the train, and he assumed that the engineer would brief the guards about any safety issues on the locomotive (Tr. 39).  Mr. Phelps was familiar with the plaintiff's past medical history, as Mr. Partin had completed a supplemental employment survey for Weiser (P ex. 16) before commencing work for Weiser.  In this document, the plaintiff described his prior medical history, including back surgery, continued back pain, inability to lift heavy objects, and the fact that he was taking medication for pain.  Mr. Phelps took that into consideration before plaintiff began working at the PPG plant (Tr. 24).

The engineer on the train at the time in question was Jacob Cooper.  Mr. Cooper assumed that Mr. Partin had previously ridden the train; however, there is no evidence to that effect in the record and Mr. Partin's uncontradicted testimony is that he had never ridden the train before.  Mr. Cooper further assumed that Weiser personnel would have instructed Mr. Partin relative to any safety concern while riding the train.  Although he had no actual recollection of Mr. Partin or his time on the train, Mr. Cooper testified that he would have only told Mr. Partin in general terms what they would be doing during the relevant 3 hour time frame (Tr. 131-134).

When Mr. Partin exited the train at about 3:00 P.M., he made mention to Mr. Phelps that riding the train was rough, but did not indicate that he was injured.  According to Mr. Partin, he mentioned to three fellow security guards that he felt as though he had been in a fight with Evander Holyfield.  The next morning, May 12, Mr. Partin complained to Mr. Phelps about pain in his neck when he woke up that morning (Tr. 66-67).  Mr. Partin was seen later that morning by Dr. Carl Nabours and diagnosed with a cervical sprain with recorded complaints of neck pain and pain that radiated to his shoulders (P ex. 21).  Mr. Partin was subsequently seen by a number of other doctors, underwent three surgeries, and continues to take pain medication, all of which will be discussed hereinafter.

The court believes that the foregoing account is essentially undisputed by the parties.  Plaintiff claims that KCS is liable for injuries he sustained in the train ride by reason of negligence in failing to warn him and/or train him about how to ride in a locomotive engine.  He claims that his complaints and subsequent treatment were all causally related to the train ride.  Mr. Partin seeks damages for pain and suffering, medical expenses, and loss of past and future earnings and earning capacity.  KCS denies any negligence or fault and also denies any causal relationship between the train ride and Mr. Partin's physical condition.

The court notes that Mr. Partin's medical expenses have been paid by Weiser's workers' compensation carrier (Liberty Mutual), and he has likewise been receiving weekly benefits.  A stipulation to that effect has been entered into the record.  It is further noted that Mr. Partin has been awarded and is receiving Social Security Disability benefits.

*Negligence*

The concept of "negligence" as understood and applied under Louisiana law is succinctly

3

explained in the Louisiana Supreme Court case of <u>Dobson v. Louisiana Power and Light Company</u>,

567 So.2d 569 (La.1990) as follows:

> The generally accepted view is that negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. (citations omitted) The test of determining whether a risk is unreasonable is supplied by the following formula.  The amount of caution "demanded by a person by an occasion is the resultant of three factors: a likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice, or the cost of the precaution he must take, to avoid the risk". (citation omitted) If the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions are sacrificed the interest is negligence.  (citations omitted)...

The job assigned to the plaintiff on the day of this alleged "incident" was to ride in the

locomotive with a radio.  If he was alerted to an emergency in one of the plants by a communication

from PPG, he was to relay that information to the engineer, who would then pass it on to other KCS

employees for appropriate action on their part.  Mr. Partin's description of his three hour ride in the

KCS locomotive is tantamount to how you might expect a greenhorn cowboy's description of riding

a raging rodeo bull might sound.  The only difference would be that the agony suffered by Mr. Partin

would extend over a much longer period of time (3 hours), whereas the bull ride would only last a

few seconds. The court notes that the record reflects that Mr. Partin was 6 ft 1 inch tall and at the

time in question weighed 280 pounds.  He had been at the PPG plant for some two months prior to

May 11, 2009, and his description of how the coupling of the trains sounded is as follows:

> I mean you could hear them, yeah.  It was very loud.  I couldn't tell inside
>
> until I got in it; but, yeah, you could hear them connecting back and forth.  Sound real
>
> – (claps hands) banging and crashing.  It was loud.  I mean, you can't not miss them.
>
> I live three, four miles from a train yard now.  I hear them connecting all the time.

Very loud.

Plaintiff's counsel followed up with Mr. Partin's testimony as follows:

> Q. Did you see the slack action that we were talking about where it would slam together and then bounce back and forth apart?
>
> A. Oh, yes, sir.  Yeah.  They were always connecting cars over there, always moving trains. (Tr. 158)

The record clearly establishes that Mr. Partin was thoroughly aware, if he is to be believed, of the "grave peril" associated with riding on a locomotive.  Presumably, based upon that knowledge, he describes his actions in the engine as follows:

> Q. Were you ever holding on the handrails, the handles of the seat?
>
> A. Yes, sir, I was holding on.  Also had my feet – trying to prop my feet up against anything I could to not fly out of the seat.
>
> Q.  And did the coupling or the slack action happen when your feet were propped up against the wall?
>
> A.  Both.  It didn't matter what position I was in.  It would sturdy me up if I was holding, but I would still be going back and forth in the train with that slacking coupling action.
>
> Q.  Were you grasping on to the handles during any of those periods of time when then coupling or slack action was happening?
>
> A.  I was grasping the handles probably the whole time because I never know when we were going to hit. (Tr. 163)

Mr. Partin testified further at pages 163 and 164 as follows:

Q.  Tell the court if there is anything else that happened inside that train car during that 3-hour time that you hadn't already described.

A.  I just remember a lot of intense–like I told you before, when they hit it was almost like a collision like a crash.  And I was always back and forth back and forth moving.  And first couple of times I didn't realize what was going on.  It actually threw me out of the chair which I said the conductor even laughed at me one time. The whole time it was violent.  You didn't know when it was going to happen. And, you know, it lasted three hours.  So the whole time I was hanging on, white knuckling the seats, getting thrown around this train, metal box, hot metal box.  (Tr. 163-164)

At pages 162 and 163, the following colloquy between Mr. Partin and his counsel is recorded:

Q.  What happened during that three hour period?  How many cars were made up?  How many crashes did you feel?

A.  I couldn't even count them, there was so many.  There was, I mean just one after another.  You never knew when they were coming.  He was sitting here talking about the five, ten.  I never knew anything about that.  You know, all of a sudden, you are sitting there, you get hit.  You didn't know when the next one was coming.  Then hit again.  No seatbelt or anything to hold you in your seat.

Q.  Did you ever come out of your seat because you were hit so hard?

.          A.  Several times.

So, with his words, Mr. Partin paints himself, a 280 pound man, being flung about the

6

locomotive engine like a rag doll . This is so even though he was holding on to the chair arms for dear life, "white knuckling." Despite the agony of his ordeal, Mr. Partin never confronted Mr. Cooper to advise him he had any problems, needed to be let off the train, was suffering intolerable pain, etc. He claims that the most he did was utter some profanities, whether whispered or screamed is not clear. His testimony is to the effect that the noise in the engine was so great that he could not be heard. (Tr. 202-203)

Jacob Cooper, the engineer, provides a vastly different description of riding in a locomotive. First of all, he readily admitted that he did not recall this specific occasion and could not identify Mr. Partin in court. He has been a railroad employee since 1998 and an engineer since 1999. (Tr. 74-75) In response to questions by plaintiff's counsel, Mr. Cooper acknowledged that he had received training pursuant to federal regulations about riding in trains, which included forces involved in the coupling process and how to prepare for same. (Tr. 95) The court notes that regulations were introduced into evidence by the plaintiff, but no specific regulations were called to the court's attention either at trial or in brief. It appears that these regulations are directed at and pertain to the training of railroad personnel, and the court has not been directed to anything in the regulations regarding any requirement that railroad personnel train other people about how to ride in a locomotive. In response to questions by plaintiff's counsel, Mr. Cooper readily admitted that during coupling, sometimes there is motion of the body and neck moving back and forth or side to side, but sometimes a coupling is made without the passengers in the locomotive feeling anything. (Tr. 105-106) Mr. Cooper's personal goal, when coupling, is just to have a click, but sometimes there is a bump during the process. (Tr. 26) Mr. Cooper made it clear that while operating in the plant, they were not constantly coupling, but they were moving lots of train cars within the plant. (Tr. 88-89)

Mr. Cooper further testified that when preparing to couple, the brakeman would tell him over the radio how far he was from the point of coupling. (Tr. 90-91) Mr. Partin would have been sitting only six or seven feet from him, and even though both men would have been wearing ear plugs, the radio communication from the brakeman, which Mr. Cooper would have repeated to the brakeman, could have been heard by Mr. Partin.  (Tr. 118-124) Mr. Cooper further testified that despite the noise level in the locomotive, persons can have a normal conversation.  (Tr., Vol. II, 11-12)

The court notes, and it is unrefuted, that Mr. Cooper testified that during his fifteen years as a railroad engineer, he has never been injured while riding in the locomotive and has never had anyone claim that they were injured while riding in a locomotive with him.  (Tr. Vol II, 5) He further testified that the seat in which Mr. Partin was riding was the same kind of seat in which he was riding and that he would have felt the same kind of bumps and jolts that Mr. Partin would have felt. (Tr. 118-120) It is significant to note that Mr. Bruce Phelps, the security guard supervisor at PPG, testified that not one other security guard made any complaints about any injuries or rough riding while on a KCS locomotive.  (Tr. 72) The court has reviewed the photographs in plaintiff's exhibit 11, which depicts the exterior of the locomotive and pertinent areas in inside it.  The seat in which Mr. Partin would have been riding is shown to have had a well-cushioned bottom and back, as well as padded arm rests.  Mr. Cooper testified that he had never seen anyone knocked out of a seat while he was operating a locomotive. (Tr. Vol II, 6) With regard to Mr. Partin's claim that Mr. Cooper laughed at him when he was knocked out of his seat, the following testimony of Mr. Cooper appears at page 6 of Vol. II:

> Q.  I want to ask you for your assessment of the factual accuracy of a statement.  If Mr. Partin claims that he was knocked around violently, knocked up out

8

of his seat, while riding on a train with you and that on one of these occasions you

watched that happen and you laughed, what is your assessment of the factual

accuracy of that statement?

     A. That would be absurd.

     Q. And why do you say that?

     A. Because, I mean, I am just not that person.

     Q. Okay.  Have you – –

     A. I would be more concerned.  If an incident would have occurred in any

situation with anybody, I would be – – for sure would not laugh.

As stated above, KCS provided railway services in PPG's plant to PPG.  When Mr. Partin,

as an employee of Weiser, entered the locomotive to have a seat as depicted in plaintiff's exhibit 11,

Mr. Cooper had no idea whatsoever of Mr. Partin's background and training.  There is no evidence

that Mr. Partin asked any questions or requested a briefing about how he should sit in the

locomotive.  For all Mr. Cooper knew, Mr. Partin may have been a seasoned guard on a railroad train

in the past.  At 6 ft 1 in. tall, and 280 pounds, he was certainly brawny enough to appear able to sit

in a seat in a locomotive without any threat to his safety.  Conversely, Weiser, Partin's employer, had

previously been informed that Mr. Partin had had prior back surgery as shown in plaintiff exhibit 16.

That document further informed Weiser (falsely, to be sure) that he suffered from continued back

pain and that he was taking medication for that back pain(by his own admission, any medication

would have been to placate his addiction).  He claimed an inability to lift heavy objects, but despite

the history provided by Mr. Partin, Weiser hired him with full knowledge of his "alleged condition,"

assigned him to work at the PPG plant and assigned him to train duty.  (Tr. 24)

The court having heard the testimony in this case and having reviewed the exhibits, has come to the unwavering conclusion that there was no obligation or duty on the part of KCS personnel to conduct a tutorial for Mr. Partin to prepare him to sit in a cushioned seat in a locomotive armed only with a radio.  The court further concludes that there were no hazards to even Mr. Partin's alleged fragile vertebral column posed by the train ride.  The account of that ride, in light of the evidence as a whole, begs belief even if it had come from a resurrected Honest Abe.  Coming from Mr. Partin, for reasons which will hereinafter be made clear, it is beyond ludicrous.  Mr. Partin did not appear to the court to be even slightly mentally challenged.  It is the court's opinion that he could easily have heard and interpreted the communication by radio between Mr. Cooper and the brakeman as the couplings were approached.  It was Mr. Partin's own testimony that he knew about the "violence" involved in the couplings, and for that reason during the entire trip he held on as tightly as possible (white knuckled), so what more could the railroad have done to insure his safety?  Of course, the court simply does not believe that the couplings occurred with anywhere near the violence described by Mr. Partin, or if he were having such an agonizing time on the train, that he would not have communicated his distress to Mr. Cooper, which he admittedly did not.  The court further believes the testimony of Mr. Cooper that the noise in the locomotive was not such that Mr. Partin could not have easily apprised Mr. Cooper of his anguish.

The court concludes that there is no evidence that Mr. Cooper operated the locomotive in a negligent manner in any way and that there was no negligence on the part of Mr. Cooper or any other KCS employee implicated in this matter.  In view of this conclusion, the court could end its opinion at this point, but to better explain why the court totally rejects Mr. Partin's version of these events, a discussion of the issue of causation follows:

*Causation*

In this case, it is undisputed that the plaintiff bears the burden of proving his case by preponderance of the evidence. As stated above, he has not done so. What has been proven beyond a reasonable doubt is that Mr. Bruce Partin is a self-confessed inveterate liar. This court is convinced that through his chicanery the plaintiff has made dupes of the physicians who treated him before and after May 11, 2009, his workers' compensation benefactor, and the Social Security Administration.

Mr. Partin underwent lumbar disc surgery in 2002 while residing in Mexico. Mr. Partin testified at deposition in this case and during the trial that his low back never caused him any problems whatsoever following his back surgery, yet he continued to see doctor after doctor complaining about his back for the sole purpose of obtaining drugs. (Tr. 183-188) In answer to one of defense counsel's questions, his response was:

> A.  Sir, I already made a point that I was doctor shopping for drugs to get
>
> high, not because of my pain.  Yeah, I got medicine.  It was all to get the medicine.
>
> (Tr. 187)

Mr. Partin, complaining of nonexistent back pain, saw Dr. Frank Lopez, a Lake Charles pain management physician, in order to get oxycontin. Dr. Lopez discharged him as a patient because he discovered Mr. Partin was getting methadone, another narcotic drug, from another doctor. Thereafter, he was persuaded by his wife to be admitted into the Allen Parish hospital in Kinder, Louisiana for inpatient detox treatment. (Tr. 188-189) This was in May of 2005. On defense exhibit 8, the records of the Allen Parish hospital, he admitted to his "doctor shopping" for drugs and ardent desire to get off the drugs so he could function well with a minimum of "chronic pain". He told the

11

hospital personnel that he had been unable to find a way to adequately control his legitimate pain, and provided a past medical history which is recorded in the hospital records as follows:

"The patient sustained lumbar spinal vertebral pain injuries including herniated discs which did not respond to surgical treatment very well and he refused recommended further surgery." (Def. Ex. 8)

So, plaintiff who has had no pain in his low back since his operation now represents to the hospital that he had multiple discs which did not respond well to surgery and left him with chronic pain. He was discharged from the hospital in order to follow up with a doctor Mahoney for addiction problems and with a Dr. Mayes for pain management.  Mr. Partin did not follow up with either physician. (Tr. 190) The next doctor's name that surfaced was a pain management doctor named Carolyn Smith from Lafayette. At the time he saw her, he was being prescribed 40 mg. of methadon three times per day by an unidentified physician, and Dr. Smith proposed to reduce his dosage. Understandably, Mr. Partin saw her for only a short time.  (Tr. 190-192)

Thereafter, Mr. Partin targeted a doctor, Jerry Keepers, from Friendswood and Beaumont, Texas in August of 2007.  He saw Dr. Keepers until February of 2009.  His testimony appears in part at page 193 as follows:

Q.  And what you've testified in this court today is that the entire time you were seeing Dr. Keepers your back really wasn't hurting; you were just seeing him to get drugs?

A.  Yes sir.

When Dr. Keepers first saw Mr. Partin, he provided a history that he has had no back pain since 2001; that he had done a lot of heavy lifting that day; and that he woke up the next day and was

12

not able to move.  The court notes the similarity between this history and plaintiff's chronicle of his

history in the case sub judice.  He further advised Dr. Keepers that his pain level was 8 out of 10 on

a visual analogue scale.  Plaintiff described his non-existent pain to Dr. Keepers as "the pain never

seems to stop and nothing seems to make the pain better." (D Ex. 37, pg 11-12)   Dr. Keepers

stressed that in the treatment of any patient, it was critical that the patient be truthful and honest in

the history to enable him to provide the best possible treatment. (D Ex. 37, pg 14) Mr. Partin's

testimony at trial (Tr. 193) appears as follows:

> Q.  And what you've testified in this court today is that the
>
> entire time you were seeing Dr. Keepers  your back really wasn't
>
> hurting; you were just seeing him to get drugs?
>
> A.  Yes sir.

Based upon Mr. Partin's false representations, Dr. Keepers saw and treated the plaintiff on

practically a monthly basis for about two and one-half years.  In fact, in October and November of

2007, the plaintiff underwent lumbar epidural steroid injections by Dr. Keepers to relieve his "pain."

(D Ex 37, pg 25) A review of  Dr. Keepers' records reveals that on each monthly visit he prescribed

the unnecessary and narcotic pain medication methadon.   Based upon an MRI prescribed by Dr.

Keepers, which revealed some spinal degenerative changes and some mild spinal stenosis at L2-3,

Dr. Keepers thought there may have been an inflamed nerve root due to a bulging disc.  He admitted

that the findings on the MRI could also indicate an asymptomatic spine, because all degenerative

changes and bulging discs do not cause symptoms.  He would need to rely upon the information from

the patient as to whether he was in pain or not. (D Ex 37, pg 25-28)  Dr. Keepers was so convinced

of plaintiff's sincerity that in May of 2008, he began discussions with him concerning surgery to

install an intrathecal narcotic pump that would pump pain medication directly into the painful area. Initially, Mr. Partin resisted this procedure but later agreed to it.  Dr. Keepers referred plaintiff to a psychologist for an evaluation in order to rule out significant anxiety or depression, which would be contraindicative of the pump.  On the September 24, 2008 visit, Mr. Partin reported that he had completed the psychological evaluation and further stated that "he continues to experience constant intractable back pain without any changes in his pain or physical condition since last appointment." (D Ex 37, pg 34-48)

Beginning with a September 4, 2008 consultation, Mr. Partin reported to Dr. Keepers that he had completed the psychological evaluation and he continued to represent that to Dr. Keepers. On the January 15, 2009 visit, he stated that he had had the evaluation done just before Christmas. On his January 29, 2009 report, Dr. Keepers noted that he had discovered that Partin had never seen the psychologist for evaluation, and at that time discharged him from further care.  Even as late as February 12, 2009, he "swore up and down that he has seen Dr. Smith (for the psychological evaluation)", but Dr. Keepers had confirmed with Dr. Smith that this was a fabrication.  (D ex. 37, pg 38-41) At trial, the plaintiff represented to the court that Dr. Keepers discharged him from his care for doctor shopping, but when confronted with evidence to the contrary admitted that Dr. Keepers refused to treat him further because he had lied to him repeatedly about the psychological evaluation. (Tr. 195-196) The court notes specifically the emphasis placed on truthfulness of the patient in arriving at an accurate diagnosis as testified to by Dr. Keepers.  The court further notes that plaintiff was convincing enough in his protestations of intractable pain that Dr. Keepers continued to treat him, prescribe narcotic drugs, performed two lumbar epidural steroid injections, and was prepared to implant an intrathecal pain pump.  Mr. Partin's adeptness at deceit is indeed remarkable.

14

Following his dismissal by Dr. Keepers, Mr. Partin's next documented medical encounter occurred on March 17, 2009, when he admitted himself into St. Patrick's Hospital in Lake Charles, Louisiana, for in-patient detox. (Tr. 197; D Ex. 13) There, though he was ostensibly seeking help for his drug dependency, he continued his pattern of dissembling. The St. Patrick's record (D Ex. 13) reflects that Partin denied drug use but tested positive for marijuana and benzodiazapine. He told his consulting psychiatrist, Dr. David Buttross, that Dr. Keepers had thrown him out of his office because he (Partin) wanted to get off his remaining methadon. Mr. Partin was discharged from St. Patrick Hospital on March 21, 2009 with the notation that an appointment for him had been scheduled with Rick Proffitt on March 23, and it is also noted that he was to follow up on the detox treatment with his family doctor, Dr. Gerald Mouton. Mr. Partin admitted that he never saw either of these gentlemen. (Tr. 200-201) It was the opinion of Dr. Buttross that plaintiff would have required twenty plus treatments of psychotherapy for Mr. Partin to conquer his drug dependency. (D Ex. 38, p 22) The fact that Mr. Partin did not follow up at all with any psychotherapy sessions indicated to Dr. Buttross that Mr. Partin was not motivated for sobriety at the time of his discharge in March of 2009. (D. Ex 38, pps 45-46)

On May 11, 2009, less than two months after his discharge from inpatient detox and without the benefit of any follow up therapy, Mr. Partin made the fateful three hour excursion on the KCS locomotive. As noted above, Mr. Partin mentioned to Mr. Phelps and to three fellow security guards that the ride had been a rough one when he left the train around 3:00 P.M. on May 11. The next morning, he reported to Mr. Phelps that his neck was hurting, stating:

> When I woke up the next day I couldn't move my neck. I was in a lot of pain.

(Tr. 166)

The plaintiff saw Dr. Carl Nabors, a general practitioner in Lake Charles, on May 12, 2009. Dr. Nabors records the history as related to him by Mr. Partin:

Patient's words: Neck and <u>back</u> pain – was jarred several times yesterday while riding on train cars that were doing a lot of switching during the three hours pt. was on board***

On examination, Dr. Nabors noted that the plaintiff holds his neck stiff and straight and had complaints of increased pain with motion in any direction. He further commented that he found no palpable abnormality. The court interprets that as meaning that he noted no objective physical signs of injury such as muscle spasms. Dr. Nabors had x-rays made, which the radiologist interpreted as mild degenerative disc changes at C5-6 with small posterior osteophytes. Dr. Nabors, on this first visit, prescribed ice, heat and Alleve. The plaintiff saw Dr. Nabors one more time, on May 13, 2009, at which time Mr. Partin told him that he would continue working and continue with the ice, heat, and Ibuprofen. Mr. Partin was to return the following week, but there is no record of any further follow up by Dr. Nabors. (P Ex 21)

Mr. Partin, as far as the record discloses, next consulted with Dr. Clark Gunderson, an orthopaedic surgeon in Lake Charles. The first visit to Dr. Gunderson was on June 16, 2009. He reported to Dr. Gunderson, concerning the train ride, that the jarring motion on the train caused <u>immediate</u> pain to his neck and right shoulder, which contradicts his statement to KCS personnel and to Dr. Nabors. (Tr. 216) In completing the questionnaire for Dr. Gunderson on this first visit, Mr. Partin again lied by answering "No" to a specific question, "Have you had a history of alcohol or drug abuse in the past?" Mr. Partin obtained a prescription for hydrocodone and for Soma, and he did not tell Dr. Gunderson anything about his prior addiction, but rather falsely denied it.

16

Dr. Gunderson referred plaintiff to Dr. David Drez, another Lake Charles orthopaedist, for treatment of Mr. Partin's shoulder complaints. Dr. Drez testified that the plaintiff denied, on at least three occasions, that he had any discrete injury to his shoulder. Dr. Drez further testified that he had repaired a posterior labral tear of Mr. Partin's shoulder. He also testified that this condition rarely causes symptoms and is often seen in people over forty years of age. (Ex. J-1, pp 7-11, 21) Dr. Drez further testified that Mr. Partin had achieved a good recovery from the shoulder operation and that it would cause no future work restrictions. (Ex J-1, pp 13-14) It was Dr. Drez's opinion that the shoulder injury did not appear to be caused by the train ride based on the history that Mr. Partin gave to Dr. Drez. (Ex. J-1, pp 14-15, 20-21)

Regarding the neck complaints, Dr. Gunderson treated Mr. Partin from June of 2009 until the spring of 2012. During that entire period, Dr. Gunderson was unaware of Mr. Partin's drug addiction and the lies that he had told physicians who had treated him earlier. (Tr. 183-188) Dr. Gunderson testified that he had accepted Partin's history and complaints as truthful, since he was unaware of any reason to disbelieve him. (P Ex. 30 pp 8-9) The court has reviewed the entire deposition of Dr. Gunderson and notes no reference whatever to any objective findings by him on physical examination. He testified that the degenerative changes in the plaintiff's cervical spine revealed in an MRI and in x-rays taken the day after the train ride were such as he would expect in an individual Mr. Partin's age. (D Ex. 30 p 15) More specifically, Dr. Gunderson, when asked whether the changes were caused by the train ride, testified:

Either caused by or rather symptomatic based on the history. (emphasis added)

Dr. Gunderson performed two surgeries on plaintiff's cervical spine, after which Partin

17

continued to complain of being in constant pain and getting no relief from the surgeries.  While still under the care of Dr. Gunderson for his neck problems, in May of 2010, the plaintiff came under the treatment of Dr. Earl Soileau, a general practitioner in Lake Charles.  Mr. Partin told Dr. Soileau that he suffered from chronic low back pain and asked for Suboxone which he said had been previously prescribed by a Dr. Anderson, otherwise not identified in the record. Dr. Soileau prescribed Suboxone, but required Mr. Partin to participate in a recovery program.  (Def. Ex 36, pp. 8-15) Mr. Partin did not apprise Dr. Soileau that he was getting prescription narcotics from Dr. Gunderson, nor did he apprise Dr. Gunderson that he was being prescribed drugs by Dr. Soileau.  Partin admitted at the trial that his low back was giving him no problem while seeing Dr. Soileau, yet he underwent an MRI ordered by Dr. Soileau in June of 2010.  The court notes that on July 14, 2010 Mr. Partin saw Dr. Gunderson for neck pain and Dr. Soileau for back pain and obtained prescriptions for narcotics from both. (Tr. 219-221)

After being notified by Blue Cross through a controlled substance program notification letter that the plaintiff was getting multiple narcotic prescriptions filled from multiple doctors, Dr. Soileau confronted Mr. Partin.  Dr. Soileau's testimony concerning this episode appears at pages 27-28 of Dr. Soileau's deposition (D Ex 36) as follows:

> Well, he was confronted about getting prescriptions from workers' comp and multiple places and often.  Said initially he was not taking them but then had to get them to make his workers' comp case go through.  But when asked to bring in the prescriptions to make sure he was not taking them he confessed that he still wants the Suboxone.  He confessed he was taking them apparently.  Says he has been going to NA meetings but does not appear to be telling the truth because he didn't know much

about it.  Contacted pharmacies and he is getting medications from several MDs and several pharmacies.

Q.  OK.  Where it says, "but does not appear to be telling the truth," that was your assessment?

A.  That's my assessment because I asked him some questions about NA meetings and he didn't seem to know how they worked.

Q.  Those were questions that, if someone had attended those, you would have expected them to know?

A.  Yes.

Q.  And it says "prescription drug addiction, needs rehab."  At this time did he ever tell you that he had actually been in two different inpatient detox programs?

A.  No.

It is noted that Mr. Partin came back to Dr. Soileau's office asking for a prescription for Suboxone to alleviate knee pain that manifested itself after he had been sanding floors.  Dr. Soileau's office declined the request.  (Def.Ex. 36, pp. 31-33)

Because Partin asked Dr. Gunderson for a referral to a psychiatrist for treatment of depression, Dr. Gunderson referred plaintiff to Dr. David Buttross in the summer of 2011.  Dr. Buttross did not recall having seen Partin in March of 2009.  Partin represented to Dr. Buttross that he needed a thoracic fusion, which was denied by Dr. Gunderson. (Def. Ex 38, pg 12 and Def. Ex 30, pg 61) When Dr. Buttross inquired about past psychiatric history and prior hospitalizations, the plaintiff did not reveal his inpatient detoxes in 2005 and 2009.  (Def. Ex 38, pg 18, 32, 34 and Tr. p 228)   Plaintiff represented to Dr. Buttross that he stopped taking hydrocodone and Soma two

19

months prior to his visit with Dr. Buttross on August 22, 2011, but admitted at the trial that he was in fact taking those drugs at the time he made that representation.  (Def. Ex. 38, pp. 13-15 and Tr. 227)   He also represented to Dr. Buttross that he was in to drugs and alcohol as a young man about twenty years old, but that he conquered these problems until March of 2010, following his train accident, which was another blatant fabrication.  (Def. Ex. 38 pp. 18-21) Partin was scheduled for a return visit to Dr. Buttross, but cancelled because "something came up" and never saw Dr. Buttross again.  (Tr. 232-233 and Def. Ex. 21)

In February of 2012, plaintiff went to Applegate Recovery in Lake Charles to obtain Suboxone medication.  The doctor in charge strictly enforced a patient treatment contract that insisted on patients sustaining from alcohol, opioids, marijuana or other addictive substances, and on April 16, 2012, plaintiff "dismissed himself" from further treatment because he wanted to "continue his marijuana use."  (Tr. 233-234 and Def. Ex. 23)

Mr. Partin's indifference to steady employment is illustrated by the fact that his functional capacity evaluation was performed in the spring of 2012 by Ms. Kristina Lounsberry.  Ms. Lounsberry reported that based upon her tests, Mr. Partin could return to work at his previous security guard position without restriction, except that driving surveillance might be restricted. Dr. Gunderson testified, in accordance with the FCE test, that Mr. Partin could return to work within the guidelines set forth by Ms. Lounsberry, specifically as a security guard. (Tr. 236-237; Def. Ex 36, p. 73, 82)   Mr. Partin himself admitted that he had testified concerning his job at PPG that the hardest part about it was staying awake. (Tr. 203-204)  Mr. Partin admitted that no doctor had ever told him that he could not return to work, but he has never attempted to return to work as a security guard.  (Tr. 243-244) On questioning by defense counsel, Mr. Partin admitted that in discovery

responses in August of 2013, Mr. Partin represented that he had not applied for work since his injury in May of 2009.  At trial, he testified that he "tried to apply" at Welsh Equipment, but that he was not hired.  (Tr. 244) Without a sworn affidavit from someone in the Welsh Equipment hierarchy to support this representation, this court does not believe Mr. Partin.  Despite his professed inability to go back to work at a job whose most stringent requirement was that he stay awake, Mr. Partin was able to ride and wreck his motorcycle in May of 2013.  At the hospital in Jennings he admitted to "ETOH consumption to date."  The court is aware that ETOH is alcohol.  On cross examination, Mr. Partin claimed that he only broke his wrist and cracked some ribs in this mishap, but later admitted that he also underwent surgery for repair to his collarbone which had been broken. (Tr. 245-248) Coupled with the testimony in this case, the fact that Mr. Partin enjoyed the bumps and jolts of riding a motorcycle convinces the court that he could and should have long ago returned to work.

In addition to the myriad lies of Mr. Partin throughout this case, the court notes that Mr. Partin perjured himself by lying under oath when being deposed in connection with his workers' compensation claim.  When asked by defense counsel whether he had received any medical care or treatment from the time he moved to Lake Charles in 2003 until May 12, 2009, he responded "not that I can remember."  When confronted with this testimony, Mr. Partin said simply:

A.  Yes, sir.  I lied. (Tr. 186-188)

Plaintiff's counsel argues for the application of the Housely doctrine in this case.  Housely is based first on the premise that a claimant had an accident in the first place.  This court finds that plaintiff had no such accident as it has previously concluded.  As previously stated, Dr. Gunderson testified that the degenerative changes shown in the MRI and in x-rays taken the day following the train ride were such that he would expect in someone Mr. Partin's age, and that the changes could

be either caused by or made symptomatic "based on the history".  As previously noted, Dr. Gunderson testified that he accepted Mr. Partin's history and complaints as truthful, since he was unaware of any reason to disbelieve him.  This court has every reason to disbelieve him, and if Dr. Gunderson had been fully apprised of Mr. Partin's prior history of fabrication, it is doubted that he would have believed him either.  This court believes that Mr. Partin had a vertebral column with degenerative changes which long pre-existed May 11, 2009.  Not only Dr. Gunderson, but Dr. Soileau as well, testified that the degenerative changes exhibited by Mr. Partin were not uncommon in people age 40 or older, and the only reason he continued to treat the plaintiff after his MRI was based on plaintiff's subjective complaints.  (Ex. 36, 21-22)   We know that Dr. Soileau discovered Mr. Partin's penchant for deceit, at least in part.  As far as the record reveals, Dr. Gunderson never did. Plaintiff's counsel points to Dr. Gunderson's testimony at page 75 of his deposition (Pl. Ex 30) as follows:

> Q.  What did you diagnose Mr. Partin with?
>
> A.  A labral tear on his shoulder and initially cervical disc herniations at C5-6 and C6-7 and later C4-5.
>
> Q.  OK. Is that consistent with a three hour period of riding a top (sic) a train receiving multiple shocks, jolts, lateral sways, and vertical bouncing?
>
> A.  Yes.

In the first place, Mr. Partin was not riding atop a train, but in a locomotive in a well cushioned seat with padded arms.  Further, this court does not believe that he was subjected to "multiple shocks, jolts, lateral sways, and vertical bouncing."

It is this court's belief that Mr. Partin, a master of deceit, seized  upon an innocuous three

22

hour train ride to seek  worker's compensation, Social Security, and finally a tort claim. The secondary gain motivation for Mr. Partin is readily apparent.  He had not followed up after the March 2009 inpatient detox treatment, with Dr. Buttross which would have been absolutely necessary for him to conquer his addiction.  He needed prescriptions for pain medication to satisfy his cravings and in addition, in this instance, he saw the opportunity to obtain weekly compensation benefits and eventually Social Security disability benefits.  Based upon the functional capacity evaluation discussed above, this court does not see how Mr. Partin qualifies for either, even if we assume that he sustained a legitimate injury that required all the subsequent medical attention and prescription drugs presented in this case.  Apparently dissatisfied with the two smaller pots of gold at the ends of the Weiser and Social Security rainbows, Mr. Partin now seeks a larger one from KCS.  This court finds that his efforts are in vain.  The court concludes that there was no negligence on the part of KCS and no causal relationship between Mr. Partin's three hour train ride and his alleged injuries. Judgment will be rendered accordingly.

In view of the foregoing, the court declines to address the issue of damages for obvious reasons.

The claim in intervention of Liberty Mutual Insurance company will likewise be dismissed.

THUS DONE AND SIGNED Alexandria, Louisiana this ___8th___ day of April, 2014.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE